**FILED**

SEP 3 0 2006

CLERK

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

NORTHERN DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | * | CIV 05-1018 |
| Plaintiff, | * | |
| -vs- | * | ORDER |
|  | * | AND OPINION |
| ANDREW R. SANDLAND, JR., | * | |
| ROSELYN M. SANDLAND, and | * | |
| CORSON COUNTY, a political | * | |
| subdivision of the State of South Dakota, | * | |
| Defendants. | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On September 13, 2000, Andrew Sandland and Roselyn Sandland ("debtors") borrowed $86,387.52 from the Rural Housing Service ("RHS"), the successor to the Farmers Home Administration ("FmHA"), for the construction of a home on the Standing Rock Indian Reservation. RHS took a mortgage on a five acre tract of fee land owned by debtors on the reservation.

Debtors had no prior business dealings with RHS before applying for the loan. After the loan application of debtors was approved at the RHS office in Bismarck, ND, the debtors met with Dave Luger, the "building instructor" at Sitting Bull College. Debtors knew that students in Mr. Luger's class built what they call "modest homes"; the students provide all the labor. Students or even the college would not qualify as experienced builders or contractors and debtors knew exactly with whom they were dealing. The home selected by debtors was under construction at the time. Mr. Luger suggested to debtors that they contact Leonard Berger, the "project coordinator" from a company called Great Plains Homes; debtors followed that advice. Debtors made the decision to contract with Great Plains Homes to move and set up the house. There is no evidence that RHS was involved in any of these activities.

Debtors claim that Mr. Berger convinced them to initial blank forms provided by Great Plains "to speed up the process." Debtors also claim that Mr. Berger misled them by telling them that they would later approve the forms with "full signatures." Debtors also claim that Mr. Berger inserted the entire amount of the loan on the forms, including $20,000.00 for labor. It is unknown whether debtors have pursued any legal action against Mr. Berger. It is also unknown whether debtors have ever pursued any legal action against the builder, i.e. the college.

Debtors allege that the house was inadequately designed, built, and installed. They claim that the house is not sitting properly on the foundation. They claim that the floors buckled and the roof leaked, that lack of sloping caused water to run into the house, that poorly constructed walls and ceilings resulted in insect infestation, that the home became infested with rodents, and the list goes on. See the allegations in the answer and counterclaim (Doc. 9). Debtors allege that an employee of RHS inspected the home and determined that "workmanship and material [were] adequate" but thereafter provided debtors a list of 14 items that needed attention. Debtors admit that no "final inspection" was ever done by anyone from RHS.

RHS sent debtors the final inspection report and the check for final payment to Great Plains Homes, requesting that debtors sign and return both documents to RHS. Debtors resisted doing so until the items on the list were completed. Great Plains Homes was demanding payment, threatening to take legal action, and was pressuring debtors. RHS encouraged debtors to sign the documents to prevent a lien being placed upon the real estate. On January 4, 2001, debtors signed the final inspection report indicating that the home was 100 percent complete. Great Plains had promised debtors that Great Plains would fix all problems in the Spring of 2001 and debtors obviously relied on Great Plains to do just that. Relying on such promises, the debtors signed the so-called "final inspection report" and authorized final payment to be made to Great Plains from the loan proceeds.

Debtors continued in their efforts to require Great Plains Homes to remedy the defects and unfinished items. Debtors also contacted RHS about the problems. In November of 2001, debtors retained an attorney to bring legal action against Great Plains Homes. By that time Great Plains Homes had gone out of business and was dissolved. All of this, of course, is a tragedy for

2

debtors. With the "disappearance" of Great Plains, neither debtors nor RHS had anyone to pressure or to force compliance with the contract between debtors and Great Plains.

Debtors apparently continued to contact RHS "to assist them in completing the house." RHS informed debtors that they had signed the final inspection report and suggested they take out another loan to fix the deficiencies. In June of 2003, debtors stopped automatic withdrawal of the house payments.

Plaintiff filed the instant action to foreclose the mortgage granted to RHS, seeking principal, interest, and advancements in the total sum of $97,506.48, along with a deficiency judgment (the complaint alleges that the fair market value of the property is only $65,000).

Debtors filed a counterclaim, seeking a declaratory judgment that RHS owed a fiduciary duty and trust responsibility to debtors which RHS breached, seeking an injunction prohibiting plaintiff from proceeding with the foreclosure action, and requesting the court to invalidate the mortgage and promissory note or, in the alternative, an order requiring RHS to restructure the mortgage and promissory note. In the alternative, debtors claim relief under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671-2680, alleging that RHS breached its trust responsibility and fiduciary duty owed to debtors by failing "to use due care and negligently exercising authority, oversight, control, and final approval over the entire transaction, including approval of the mortgage, execution of the promissory note, and construction, set up and purchase of the home, and loan servicing." Debtors claim RHS breached a duty "to ensure that third parties adhered to approved plans, to discover any defects and problems with the home and site improvements, to discover any violations of applicable regulations, and to ensure that all defects, problems, and violations were cured before approving and finalizing the purchase, setup, and loan transaction." Finally, recognizing the possibility that neither of the first two claims of the counterclaim may be cognizable, debtors claim, based upon the foregoing alleged breaches of duties and trust responsibilities, that they are entitled to recoupment to reduce or defeat any recovery to the plaintiff.

Plaintiff filed a motion (Doc. 11) to dismiss the counterclaim, contending that debtors have not identified a substantive statute which waives sovereign immunity. Plaintiff contends that debtors' FTCA claim is barred because it was not filed within the statute of limitations, that

debtors failed to exhaust their administrative remedies, and that RHS owed no duty to debtors. Finally, plaintiffs contend that debtors have failed to satisfy the prerequisites to common law recoupment.

## DECISION

### Exhaustion and Limitations.

Waiver of sovereign immunity "cannot be implied but must be unequivocally expressed." United States v. Mitchell, 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980). "A necessary corollary of this rule is that when Congress attaches conditions to legislation waiving the sovereign immunity of the United States, those conditions must be strictly observed and exceptions thereto are not to be lightly implied." Block v. North Dakota, 461 U.S. 273, 287, 103 S.Ct. 1811, 1819, 75 L.Ed.2d 840 (1983). *See also*, Soriano v. United States, 352 U.S. 270, 276, 77 S.Ct. 269, 273, 1 L.Ed.2d 306 (1957).

One limitation of the FTCA's waiver of sovereign immunity is the requirement that any such claim must be exhausted, that is, presented to the appropriate federal agency. 28 U.S.C. § 2675(a). A federal tort claim must be presented to the agency within two years of the date on which the claim accrued. 28 U.S.C. § 2401(b). Debtors acknowledge that they failed to exhaust their FTCA claim at all, let alone within two years, but contend that they are not required to do so because 28 U.S.C. § 2675(a)'s exhaustion requirement does not apply to "such claims as may be asserted under the Federal Rules of Civil Procedure by . . . counterclaim."

The government waives sovereign immunity and the defense of the statute of limitations when it brings suit. United States v. Iron Mountain Mines, Inc., 881 F.Supp. 1432, 1453 (E.D. Cal. 1995). *See also*, Reiter v. Cooper, 507 U.S. 258, 264, 113 S.Ct. 1213, 1218, 122 L.Ed.2d 604 (1993) (a statute of limitations defense is not applicable to a counterclaim for recoupment), *cited with approval in* Oneida Indian Nation of New York v. New York, 194 F.Supp.2d 104, 145 note 50 (N.D.N.Y. 2002).

The United States Court of Appeals for the Eighth Circuit has held that

> when the sovereign sues it waives immunity as to claims of the defendant which assert matters in recoupment – arising out of the same transaction or occurrence which is the subject matter of the government's suit.

United States v. Johnson, 853 F.2d 619, 621 (8th Cir. 1988) (*quoting* Frederick v. United States, 386 F.2d 481, 488 (5th Cir. 1967)). "When the government waives immunity in this manner, it does so even as to those claims that ordinarily are barred by the FTCA." *Id.*

 The motion to dismiss based upon failure to exhaust or failure to file within the period of limitations must be denied.

**Recoupment**.

 Despite the jurisdictional limitation of sovereign immunity, a counterclaim may be asserted in the nature of recoupment.  United Sates v. Green, 33 F.Supp.2d 203, 223 (W.D.N.Y. 1998).

> The common law equitable doctrine of recoupment permits a defendant to assert a defensive claim against the United States, so long as such claim arises from the same contract or transaction as plaintiff's claim, to reduce the amount of the damages recoverable by the United States as plaintiff.  It "is the common law precursor to the modern compulsory Counterclaim." Thus, if recoupment applies, no independent waiver of sovereign immunity is required as recoupment rests on the principle that sovereign immunity should not prevent a private person from raising, in his or her defense, claims that arise from the same transaction or occurrence on which the government is seeking to recover damages.

United States v. Green, 33 F.Supp.2d at 223 (internal citations omitted).

> A counterclaim against the United States, which would otherwise be barred by 28 U.S.C. § 2401(b), may be asserted as a defense of set off or recoupment only if the counterclaim arises out of the same transaction or circumstances as the claim asserted by the United States. *Bull v. United States*, 295 U.S. 247,261, 55 S.Ct. 695, 79 L.Ed. 1421 (1935).

United States v. Carlson, 360 F.Supp. 842, 844 (S.D. Tex. 1973). *Accord*, United States v. Accudyne Corp., 921 F.Supp. 611 (W.D.Wis. 1995).

 Pursuant to 28 U.S.C. § 1367, this court has supplemental[1] jurisdiction over counterclaims "that are so related to claims in the action within such original jurisdiction that they form part of the case or controversy."  While this court has supplemental jurisdiction over

---

[1]"'Ancillary jurisdiction' became 'supplemental jurisdiction' on December 1, 1990, *see* § 310(a) of the Judicial Improvements Act of 1990, 104 Stat. 5089, 28 U.S.C. § 1367." Unique Concepts, Inc. v. Manuel, 930 F.2d 573, 574 (7th Cir. 1991).

compulsory counterclaims, permissive counterclaims require their own jurisdictional basis. Unique Concepts, Inc. v. Manuel, 930 F.2d 573, 574 (7th Cir. 1991). Fed. R. Civ. P. 13(d) provides that the compulsory counterclaim rule "shall not be construed to enlarge beyond the limits now fixed by law the right to assert counterclaims or to claim credits against the United States or an officer or agency thereof."

The United States Court of Appeals for the Eighth Circuit recognizes a four-part test for determining whether a claim is a compulsory counterclaim:

> 1) Are the issues of fact and law raised by the claim and counterclaim largely the same?
> 2) Would res judicata bar a subsequent suit on defendant's claim absent the compulsory counterclaim rule?
> 3) Will substantially the same evidence support or refute plaintiff's claim as well as defendant's counterclaim?
> 4) Is there any logical relation between the claim and the counterclaim?

Cochrane v. Iowa Beef Processors, 596 F.2d 254. 264 (8th Cir. 1979) (citing 6 C. Wright & A. Miller, Federal Practice and Procedure, § 1410 at 42 (1971)).

Applying the foregoing tests, I find that debtors' FTCA claim that an RHS agent negligently breached a duty to inspect and supervise the building of a home financed through an RHS loan is a compulsory counterclaim to an action by the United States to foreclose the RHS loan. The issues of fact raised by the United States' claim are contractual - whether the parties entered into a valid mortgage and whether the debtors failed to pay the note. Debtors' negligence claim is premised upon the assertion that RHS owed them a duty to inspect the premises built with the loan proceeds and a duty to ensure that the builder built a home which passed inspection and that they breached this duty in conjunction with the signing of the mortgage and promissory note. The evidence required to prove a mortgage foreclosure action is not distinctly separate from the evidence required to prove debtors' negligence claim. There is a logical relation between the claim to foreclose the mortgage and the claim that RHS breached some duty in relation to the loan and loan proceeds.

The United States Court of Appeals for the Fifth Circuit came to the same conclusion in Frederick v. United States, 386 F.2d 481 (5th Cir. 1967). Frederick was an action by the United States against Frederick as an individual guarantor of a mortgage and note which the United

6

States had previously foreclosed.  Frederick complained that the United States had purchased the loan collateral at foreclosure sale at an inadequate price ($44,100.00 as opposed to the alleged fair market value of $299,000.00), thus resulting in a deficiency which the United States sought to collect from him.  The Fifth Circuit held that Frederick's claims arose out of the same transaction or occurrence, thus affording Frederick the right to raise his claims by way of counterclaim.  Frederick, 386 F.2d at 489.

This case is somewhat similar to United States v. Carson, 360 F.Supp. 842 (S.D. Tex. 1973).  In Carson, the FmHA sued to foreclose a mortgage.  The debtors filed a counterclaim alleging that FmHA agents inspected the mortgaged property (citrus trees) after a freeze and required them to maintain dead trees for a period of ten years upon threats of foreclosure, which maintenance caused them to incur expenses and prevented them from taking outside employment, resulting in having to borrow additional money.  During the years they were required to maintain the dead trees, their property decreased in value, resulting in the possibility of a deficiency judgment in the foreclosure action.  The District Court in Carson concluded that debtors' alleged tort claim "concerned the property securing the notes" and therefore the counterclaim "arises from the same transaction or occurrence."  Carson, 360 F.Supp. at 844.

Whether or not the debtors' claims would qualify as a compulsory counterclaim, thus excusing compliance with the strict requirements of the FTCA, their counterclaims fail because they seek relief which is different in kind or nature to that sought by the government or exceeding the amount of the government's claims.  The United States "does not waive immunity as to . . . claims of a different form or nature than that sought by it as a plaintiff nor to claims exceeding in amount that sought by it as plaintiff."  Frederick v. United States, 386 F.2d at 488.  Debtors do not seek merely a recoupment to the extent of the government's claim.  They seek, in addition, an injunction prohibiting the foreclosure itself, additional relief necessary to remedy the alleged breach of fiduciary duties allegedly owed to them, declaratory relief invalidating the mortgage and promissory note, restructuring of the mortgage and promissory note, and a judgment against the United States for damages.  Such claims are barred by the statute of limitations.

**Duty**.

The final problem with debtors' counterclaim for recoupment "is that in order to have a counterclaim in recoupment [debtors] must first have a claim, because a counterclaim is a 'claim which at the time of serving the pleading the pleader has against any opposing party . . .'" FDIC v. Cheng, 787 F.Supp. 625, 636 (N.D. Tex 1991) (*quoting* Fed. R. Civ. P. 13(a)). Debtors contend that they have a tort claim under the FTCA. The FTCA waives the sovereign immunity of the United States in tort cases, making the federal government liable "in the same manner and to the same extent as a private individual under like circumstances . . ." 28 U.S.C. §2674. The United States Supreme Court reminds us in United States v. Olson, ___ U.S. ___, 126 S.Ct. 510, 163 L.Ed.2d 306 (November 8, 2005), that the FTCA waives sovereign immunity only in circumstances where local law would make a private person liable in tort. Olson, ___ U.S. at ___, 126 S.Ct. at 511.

The "law of the place where the act or omission occurred," 28 U.S.C. § 1346(b)(1), is the law of the state wherein the action or inaction occurred. LaFromboise v. Leavitt, 439 F.3d 792, 796 (8th Cir. 2006). This court's obligation is to look for a state law analogy similar to the activities of RHA in connection with the loan to determine whether private individuals "may create a relationship with third parties that is similar to the relationship" between RHA and debtors. Olson, ___ U.S. at ___, 126 S.Ct. at 513.[2]

Debtors claim that RHS was negligent in inspecting the property, in not conducting a final inspection, and in supervising or not supervising the construction and moving of the house. Claims are also made that actions of RHS in preparing or causing the preparation of the note, mortgage, and related documents also serve to impose liability on RHS. These claims are rejected out of hand. Any lender is going to prepare and use such documents. Inspection activities were undertaken based upon federal regulations designed to protect the collateral of RHS. "Negligent performance of a federal statutory duty may give rise to a claim under the

---

[2]The United States Court of Appeals for the Eighth Circuit refers to Olson's "state law analogy" rule as a "private analogue" rule. Green Acres Enterprises, Inc. v. United States, 418 F.3d 852, 856 (8th Cir. 2005) ("in other words, the claim must be such that a similarly situated private party would be liable for the same conduct in [South Dakota]").

Federal Tort Claims Act, but only in circumstances in which applicable State law would recognize a private cause of action . . . Failure to perform a federal duty does not in and of itself create any corresponding duty imposing private liability under the State Law." Tuepker v. Farmers Home Admin., 538 F.Supp. 375, 377 (D.Mo. 1982). "Before liability may be imposed on the theory of negligence there must be a duty on the part of the defendant to protect a plaintiff from injury." Clausen v. Aberdeen Grain Inspection, Inc., 1999 SD 66, ¶ 11, 594 NW2d 718, 721. Debtors suggest, without citation to any authority, that a private person who undertakes to supervise the construction of a home and the management of a loan is liable under South Dakota's Good Samaritan doctrine for failing to exercise due care in doing so. Debtors' claims that RHS undertook any activities or agreed to undertake any activities to supervise the construction or moving of the home fly in the face of other allegations by debtors.

South Dakota recognizes the "Good Samaritan Doctrine" as embodied in the Restatement (Second) of Torts, § 324A:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>> (a) his failure to exercise reasonable care increases the risk of such harm, or
>> (b) he has undertaken to perform a duty owed by the other to the third person, or
>> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Kuehl v. Horner (J.W.) Lumber Co., 2004 SD 48, ¶24, 678 NW2d 809, 814 (2004). Debtors have not identified any duty RHS owed them in regard to performing an inspection of the property. Debtors must therefore show that RHS nonetheless undertook such a duty. *Id* at ¶25, 678 NW2d at 814. *See also*, Schultz v. Mills Mutual Ins. Group, 474 NW2d 522, 526 (SD 1991). Merely acting for its own benefit does not create a duty. *Id*.

Debtors contend that the RHS employee who was working with them on the loan "had a duty to use due care to ensure the house builder adhered to approved plans and cured defects before completing construction . . . RHS and its' employee affirmatively assumed and retained

9

authority, oversight, control, and final approval over the entire transaction. (*sic*) Including approval of the land mortgage, execution of the promissory note, set up and purchase of the home and loan servicing." Debtors have identified no statutory or common law authority requiring a lender to do so. In fact, the federal regulations specifically tell us and the parties that RHS would undertake no such a duty in conjunction with inspections and instead state that RHS

> will make final inspection of all development work and periodic inspections as appropriate to protect the security interest of the government . . . The borrower will be responsible for making inspections necessary to protect the borrower's interest. Agency inspections are not to assure the borrower that the house is built in accordance with the plans and specifications. The inspections create or imply no duty or obligation to the particular borrower. Agency inspections are for the dual purpose of determining that the Agency has adequate security for its loan and achieving the statutory goal of providing adequate housing . . . (emphasis supplied).

7 C.F.R. § 1924.9.[3]

Part 1924 sets forth the policies, methods, and responsibilities of the FmHA or its successor agency "in the planning and performing of construction and other development work for insured Rural Housing . . . loans for individuals." 7 C.F.R. § 1924.1. Throughout Part 1924, the agency makes it clear that the responsibilities of the county supervisor or the designee of the supervisor (who works with the loan applicant) in planning, development, and project oversight are made "in order to protect FmHA" or "for the sole benefit of FmHA." *See* 7 C.F.R. §§ 1924.5(f), 1924(h).

Any inspection, oversight or approval functions were not undertaken for the benefit of debtors but solely to protect the loan collateral. RHS owed no duty to debtors as claimed by debtors. Finally, debtors cannot have reasonably relied upon any undertaking by RHS. The law is to the contrary and debtors signed a document agreeing that the actions taken by RHS were not

---

[3]If debtors had relied upon the regulations as setting forth the duty, their counterclaim would be dismissed  because claims founded on statutes or regulations exceeding $10,000 are in the exclusive jurisdiction of the Court of Federal Claims. United States v. House, 100 F.Supp.2d 967, 978 n. 7 (D.Minn. 2000) (*citing* Polos v. United States, 556 F.2d 903, 905 (8th Cir. 1977)).

taken to protect the debtors - they were required to protect themselves. No duty arose under the Good Samaritan doctrine.

Debtors alternatively claim that RHS owed a fiduciary duty to protect debtors "due to their lack of education and living in an extremely rural and Native American culture the Sandlands are lacking in mental acuity and business intelligence. They are uninformed, unsophisticated, and at a disadvantage in financial and legal matters." Debtors further claim the federal government bears a special trust obligation to debtor Roselyn Sandland because she is an American Indian. Debtors have not identified any South Dakota law which would make a private person liable in tort to the debtors based upon these assertions.

"The existence of a fiduciary duty and the scope of that duty are questions of law for the court." Bienash v. Moeller, 2006 SD 78, ¶ 12, ___ NW2d ___, 2006 WL 2382754 (quoting Ward v. Lang, 1996 SD 113 ¶ 12, 553 NW2d 246, 250). "South Dakota law 'reflects the traditional view that fiduciary duties are not inherent in normal arm's-length business relationships, and arise only when one undertakes to act for another's benefit.'" Nelson v. WEB Water Development Ass'n., Inc., 507 NW2d 691, 698 (SD 1993) (quoting Taggart v. Ford Motor Credit Co., 462 NW2d 493, 500 (SD 1990)). "Ordinarily, a lender-borrower relationship pre-supposes an arm's length transaction, as each side works in its own interest." Buxcell v. First Fidelity Bank, 1999 SD 126, ¶ 36, 601 NW2d 593, 602.

The seminal case in South Dakota on whether a lender owes a fiduciary duty to the borrower is Garrett v. BankWest, Inc., 459 NW2d 833 (SD 1990). The South Dakota Supreme Court, looking for guidance from other courts, stated therein:

> In a commercial context, the mere rendering of advice by the lender to the borrower, even if given in a sincere effort to help the borrower prosper, does not transform a business relationship into a fiduciary relationship . . . Rather, actual day-to-day involvement in management and operations of the borrower or the ability to compel the borrower to engage in unusual transactions is required for the purposes of showing that a lending institution had "control" over a borrower.

Garrett v. BankWest, 459 NW2d at 838 (quoting Union State Bank v. Woell, 434 NW2d 712, 721 (ND 1989). In this case, RHS is not alleged to have been involved in the day-to-day

operations of any business or other affairs of the debtors.  All activities of RHS were solely, as required by federal regulations, activities to secure RHS' interest in the mortgaged premises.

     Waddell v. Dewey County Bank, 471 NW2d 591 (SD 1991), held that a relationship between a bank and its borrower can become a fiduciary relationship only if three elements are found.  First, the borrowers repose faith, confidence, and trust in the bank.  Second, the borrowers are in a position of inequality, dependence, weakness, or lack of knowledge.  Looking at the case from the viewpoint of the debtors, these first two factors are present.  Third, the bank exercises dominion, control, or influence over the borrowers' affairs.  As explained in Garrett, day-to-day management and control of the debtors' operations is required.  This third element is without question not present in the present case, just as it was not present in Waddell.  In addition, here the debtors were told by the federal regulations and in writing that RHS was acting for them but solely for itself.

     South Dakota case law is replete with references to the requirement that a fiduciary has a "duty to act primarily for the benefit of another" and such a duty arises "only when one undertakes to act primarily for another's benefit." *See* Ward v. Lange, 1996 SD 113 ¶ 12, 553 NW2d 246, 250.  Thus, in Buxcell v. First Fidelity Bank, 1999 SD 126, 601 NW2d 593, the South Dakota Supreme Court held that a fiduciary relationship existed between a ranch couple and the bank that assisted them in applying for an SBA loan to purchase a grocery store.  In Buxcell, however, the bank failed to disclose to the ranchers that the bank was about to foreclose on the owners of the grocery store because the store was insolvent.  The bank had recruited the borrowers to purchase the grocery store and provided the borrowers with cash flow information and an appraisal (both of which were misleading).  Buxcell is not applicable here.

     Similarly, in Bandreit v. Norwest Bank, 499 NW2d 613 (SD 1993), the South Dakota Supreme Court held that a fiduciary relationship existed between the bank and one of its mortgagors when it failed to forward a VA loan application.  The bank fraudulently told the borrower that the VA had denied their loan application in order to have the borrower continue his relationship with Norwest (borrower was hoping to pay off higher interest Norwest loans with a lower interest VA loan).  Bandreit is also not applicable here.

The existence of a duty and the scope of that duty are questions of law for the court to decide. Lalley v. Safway Steel Scaffords, Inc., 364 NW2d 139 (SD 1985), and Erickson v. Lavielle, 368 NW2d 624 (SD 1985). RHS was not acting in a fiduciary capacity in relation to debtors. RHS lent the money to purchase and move a home and, because of federal regulations, tried to protect its interest in the collateral by insisting that the mover comply with federal requirements. RHS was never involved in the day-to-day operations of the debtors. The debtors were aware that all actions taken by RHS were intended to protect RHS's collateral. There is no claim that RHS committed any fraud in relation to any of its activities. Debtors' claim of wrongdoing is or should be primarily against the builder and the mover. The claim against RHS is that RHS did not do a good job in guaranteeing that the mover provided a habitable home. South Dakota has not recognized a duty on the part of a lender to protect the borrower from purchasing a home with defects.

**Discretionary Function**

The discretionary function exception, 28 U.S.C. § 2680(a), is another exception to the limited waiver of sovereign immunity set forth in the Federal Tort Claims Act. If an alleged act falls within the discretionary function exception, a court is without subject matter jurisdiction, Dykstra v. U.S. Bureau of Prisons, 140 F.3d 791, 795 (8th Cir. 1998), and dismissal of the claim is warranted. *Id.* at 797.

The discretionary function exception applies to:

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or a regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). "The burden of proving subject matter jurisdiction falls on the plaintiff." V S Ltd. Partnership v. Department of Housing and Urban Development, 235 F.3d 1109, 1112 (8th Cir. 2000). Therefore, debtors have the burden to prove that the acts complained of fall outside the discretionary function exception. *See* Goldsby v. Sullivan, 735 F.2d 302, 303 (8th Cir. 1984).

In determining if the activity of the government is discretionary, the United States Supreme Court has provided two guiding principles to assist the lower courts. Berkovitz v. United States, 486 U.S. 531, 536, 108 S.Ct. 1954, 1958 (1988).

> First, the alleged action must be a matter of choice for the acting employee. *Id.* "[I]f the employee's conduct cannot appropriately be the product of judgment or choice, then there is no discretion in the conduct for the discretionary function exception to protect." *Id.* at 536, 108 S.Ct. at 1959. Therefore, in order for the discretionary function exception to apply, the government employee must have made a choice.
>
> The second guiding principle requires a court to determine whether the choice is of the kind that the discretionary exception was designed to shield. *Id.* This inquiry reflects the policy of Congress "to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." United States v. Varig Airlines, 467 U.S. 797, 814, 104 S. Ct. 2755, 2765 (1984). When engaging in this second inquiry, a court is to determine whether the judgment is grounded in social, economic, or political policy, and, if the choice is based on such policy considerations, then the discretionary exception will bar the claim. Dykstra, 140 F.3d at 795. The discretionary exception only insulates the federal government from liability in cases where a government employee makes a decision based upon considerations of public policy. Berkovitz, 486 U.S. at 537, 108 S. Ct. at 1959.
>
> In United States v. Gaubert, 499 U.S. 315, 111 S.Ct. 1267, 1274-1275 (1991), the United States Supreme Court reiterated its conclusion that the discretionary function exception only applies when a decision has been made that is the result of public policy considerations. Dykstra, 140 F.3d at 795. At a very minimum, therefore, a governmental employee must actually make a decision, a decision that comes after the employee took into account some aspect of public policy. If no decision was made, or the decision was not predicated upon public policy, then the discretionary function exception does not apply. *See* Gaubert, 499 U.S. at 322, 111 S.Ct. at 1273; Berkovitz, 486 U.S. at 536-537, 108 S.Ct. at 1958-1959; Varig Airlines, 467 U.S. at 811, 104 S.Ct. at 2763; Dykstra, 140 F.3d at 795; Tonelli, 60 F.3d at 496.

Locke v. United States, 2002 D.S.D. 22 ¶¶ 27-29, 215 F.Supp.2d 1033, 1045.

Justice Scalia, writing in a concurring opinion in United States v. Gaubert, 499 U.S. at 335, 111 S.Ct. at 1289, noted the difficulty lower courts have in applying the "policy judgment"

test for determining whether governmental actions are shielded by the discretionary function exception. The Supreme Court in <u>Gaubert</u> analyzed applicable precedents and summarized them as follows:

> [I]f a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation. If the employee violates the mandatory regulation, there will be no shelter from liability because there is not room for choice and the action will be contrary to policy. On the other hand, if a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations.

<u>Gaubert</u>, 499 U.S. at 324, 111 S.Ct. at 1274 (internal citations omitted). "When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Id.* Thus, discretionary acts are not confined to those acting at the policy level but may apply to those acting at the "operational" or "management" level. <u>Gaubert</u>, 499 U.S. at 325-26, 111 S.Ct. at 1275.

The negligent acts complained of involve loan processing and servicing. Regulations which speak in terms of "approval," "review," or "acceptable" "necessarily involve the exercise of personal deliberation and judgment." <u>Berel Co. v. Sencit F/G McKinley Associates</u>, 710 F.3d 542 (D.N.J. 1989).

> [I]n applying the broad brush of the Legislature's mandate to specific factual circumstances first, by choosing projects worthy of Agency money and second, by imposing certain custom-tailored conditions on the receipt of this funding, the Agency too engages in policy judgments which are very real. It is indeed evident that "[w]here there is room for policy judgment and decision there is discretion."

<u>Berel v. Sencit</u>, 710 F.Supp. 530, 542-43 (D.N.J. 1999) (concerning similar provisions in New Jersey statutes). The discretionary function exception shields the government from such policy judgment and decision making. <u>Williamson v. USDA</u>, 635 F. Supp. 114, 116 (S.D. Miss.) (citing <u>Moffitt v. United States</u>, 430 F.Supp. 34, 38 (E.D. Tenn. 1976)).

ORDER

15

Based upon the foregoing,

IT IS ORDERED that the motion, Doc. 11, to dismiss the counterclaim is granted.

Dated this 30th day of September, 2006.

BY THE COURT:

CHARLES B. KORNMANN
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK

BY: _____
              DEPUTY
        (SEAL)

16